# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 19-1104V
UNPUBLISHED

| | |
|---|---|
| EDWARD SAND,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: August 31, 2021<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu);<br>Guillain-Barré Syndrome (GBS). |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Sarah Christina Duncan*, U.S. Department of Justice, Washington, DC, for Respondent.

### **DECISION AWARDING DAMAGES**[1]

On July 30, 2019, Edward Sand filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered Guillain-Barré syndrome ("GBS") causally related to the influenza ("flu") vaccine he received on November 20, 2018. *See* Petition at Preamble; ¶¶ 3, 12. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this unpublished opinion contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$130,000.00 for his past pain and suffering.**

### I.   Relevant Procedural History

Approximately 18 months after this case was initiated, on September 11, 2020, Respondent conceded that Petitioner was entitled to compensation. Rule 4(c) Report (ECF No. 22). I issued a ruling on entitlement on September 21, 2020. ECF No. 23. The parties then attempted to informally resolve damages but were unsuccessful. ECF No. 29. Petitioner filed additional evidence and his brief requesting an award of $140,000.00 for past and future pain and suffering. ECF No. 32. Respondent countered that the record supported no more than $55,000.00. ECF No.33. Petitioner filed a reply. ECF No. 35. The matter now is ripe for adjudication.[3]

### II.   Relevant Medical History

Petitioner was a 61-year-old married father of three when he received the flu vaccine at issue. He was employed full-time as a maintenance worker at a local school, and owned and self-managed rental properties for additional income. *See* Ex. 4 at 6; Ex. 15 at ¶ 6. While Petitioner averred that prior to the vaccination, he was "healthy" and "active," his prior medical history included hypertension, chronic obstructive pulmonary disease for which he was prescribed two inhalers, and osteoarthritis of the bilateral glenohumeral joints. Ex. 1 at 2.

Petitioner also had a three-year history of worsening lumbar pain in his lower back and legs, prompting a laminectomy on L4-5 and L5-S1 on March 19, 2018. Ex. 1 at 6; Ex. 3 at 6-18; Ex. 9 at 1-2.[4] Nevertheless, the pain continued – rated at 9/10 – necessitating steroid injections on May 8, 2018, and August 30, 2018. Ex. 6 at 2-3; Ex. 3 at 15. Fifteen (15) days before vaccination, on November 5, 2018, Petitioner saw his neurosurgeon for continued pain throughout his right leg which was worse when sitting and driving and somewhat limited his walking. The neurosurgeon suspected that Petitioner had continued L5 pathology that was pinching a nerve. Ex. 3 at 18-20.

---

[3] I offered to schedule this case for the Motions Day in either August or September 2021. While Respondent was amenable to either oral argument or a ruling on the record as it stood, Petitioner's counsel requested the latter due to scheduling conflicts. *See* Informal Communication (Non-PDF) entered July 12, 2021; ECF Nos. 37-38.

[4] Respondent states that Petitioner "underwent two decompressive surgeries in the past." Response at 2. This may not be correct. The neurosurgeon recorded: "*His wife* underwent 2 decompressive surgeries which did not help and then had that level fused and got better. Does not want to have to go through 3 surgeries to get better *like she did* he says." Ex. 3 at 6 (emphasis added).

Petitioner received the flu vaccine on November 20, 2018. Ex. 1 at 3. He recalls that "about two weeks" thereafter, he developed weakness throughout his body, severe upper back pain, and numbness in his hands and feet. Ex. 2 at ¶ 10.

On December 14, 2018, Petitioner telephoned his neurosurgeon's office to request medication for significant pain – although the nature or location of pain was not recorded. Ex. 12 at 400. A medical assistant reviewed the prior records and presumed that Petitioner was experiencing "pinched nerve pain," for which she wrote a prescription for gabapentin 300mg, twice per day. *Id.* That afternoon, Petitioner underwent a repeat lumbar spine MRI and was scheduled for a follow-up appointment with the neurosurgeon to take place on December 24, 2018. *Id.* at 392-93.

On December 20, 2018, Petitioner presented to his primary care provider for the sudden onset of thoracic back pain rated at 9/10, for which his old post-operative pain medication (gabapentin, as noted above) delivered about 4 hours of relief. Ex. 1 at 11. The primary care provider ordered an x-ray to evaluate for thoracic back pain and prescribed a 7-day course of acetaminophen with codeine. *Id.*

On December 24, 2018, the neurosurgeon recorded that in addition to his chronic lumbar pain, Petitioner had a two-week history of new "severe acute pain… in the mid-scapular area," followed by bilateral arm weakness and gait instability. Ex. 3 at 21. The neurosurgeon felt that the "symptoms are not typical of Guyon [sic]-Barré" but were "very concerning" for cervical pathology. *Id.* He wrote a new prescription for acetaminophen-hydrocodone to take at night. *Id.*

Petitioner went on leave from his job on or about December 30, 2018. Ex. 12 at 302. On January 11, 2019, the neurosurgeon instructed him to stop taking acetaminophen-hydrocodone because it was not effective, increase gabapentin from two to three times per day, and consult with a neurologist. Ex. 3 at 25-27.

At the initial consult on January 14, 2019, the neurologist, Dr. Randall Bjork, recorded Petitioner's history that starting "around the Thanksgiving holiday," he developed new interscapular pain, numbness in his hands and feet, weakness (e.g., difficulty opening a bottle of water, climbing stairs, and rising from a chair), weight loss of a few pounds, and constipation. Ex. 4 at 6. Dr. Bjork also observed fasciculations[5] in all four extremities, diminished reflexes in the lower extremities, and reduced sensation

---

[5] A fasciculation is defined as "a small local contraction of muscles, visible through the skin, representing a spontaneous discharge of a number of fibers innervated by a single motor nerve filament." *Dorland's Medical Dictionary Online*, at https://www.dorlandsonline.com (hereinafter "*Dorland's*").

especially in the right upper extremity. *Id.* These symptoms were "disturbing" and potentially representing amyotrophic lateral sclerosis ("ALS").[6] *Id.* at 6-8. Petitioner would undergo EMG/NCV studies "when an appointment becomes available on a first cancellation basis." *Id.* at 8. The next day, the primary care provider noted that Petitioner was "very concerned" that his symptoms represented ALS and prescribed another 7-day course of acetaminophen-hydrocodone to treat his "severe," "worsening" back pain. Ex. 1 at 14.

On January 30, 2019, Petitioner had continued symptoms, especially scapular pain, and was not sure whether or not gabapentin was helpful. Ex. 3 at 28. Then on February 13, 2019, at an initial physical therapy consult, he reported that at its nadir, the pain was 10/10 and woke him up frequently at night. Ex. 12 at 304. But since the increase in gabapentin, he had "steadily gotten better," his pain never got much above 3/10, and he was sleeping through the night. *Id.* The therapist could not detect Petitioner's reported neurological symptoms (numbness, tingling, and decreased dexterity in his hands). *Id.* The therapist provided mobility exercises for Petitioner's thoracic spine, as well as core stabilization exercises for his lower back, to work on at home. *Id.* Petitioner was told to follow up after completing his neurological evaluation if there was need for further treatment of his spine. *Id.* However, on March 22, 2019, the physical therapist noted that Petitioner had not followed up and formally discharged him from care. *Id.* at 227.

Approximately five months after vaccination and two months after Dr. Bjork ordered EMG/NCV studies, on March 18, 2019, Petitioner finally secured an appointment and underwent those studies. The recorded purpose was "development of diffuse paresthesias, weakness, imbalance in November 2018, now mostly resolved." Ex. 4 at 13. The findings were consistent with a "subacute demyelinating sensorimotor polyneuropathy with signs of reinnervation" and a "possible superimposed right sciatic mononeuropathy." *Id.*

On March 25, 2019, Dr. Bjork reviewed the electrodiagnostic studies and diagnosed Petitioner with GBS that was "resolving gradually now." Ex. 10 at 10. Petitioner was able to rise from his chair. *Id.* He demonstrated more active lower extremity reflexes and fasciculations in the right interosseous nerve, which Dr. Bjork attributed to remyelination. *Id.* Petitioner wondered whether to stop taking gabapentin because his "quite troublesome" back pain had resolved. *Id.* The GBS symptoms were "receding from

---

[6] Amyotrophic lateral sclerosis ("ALS"), also known as Lou Gehrig's disease and Charcot syndrome, is defined as "a motor neuron disease marked by progressive degeneration of the neurons that give rise to the corticospinal tract and of the motor cells of the brainstem and spinal cord, resulting in a deficit of upper and lower motor neurons; it usually ends fatally within 2 to 3 years." *Dorland's*.

his primary attention" and he was "focusing more on his chronic right sciatica for which [he] ha[d] seen [the neurosurgeon] in the past." *Id.* In June 2019, Dr. Bjork recorded further improvements from GBS. Ex. 10 at 14-15.

In August 2019, Dr. Bjork confirmed that Petitioner was making "a slow and steady recovery" from GBS. Ex. 10 at 17. He demonstrated distal sensory loss of 50% in his fingers and in a long-stocking distribution of the lower extremities, as well as "a bit" of reduced sensation at the ankles, but: "Discrimination, however, was really quite good, in that he was able to pick out the denomination of coins in his pockets." *Id.* at 18. Dr. Bjork did not observe any Babinski signs, fasciculations, weakness, or gait abnormality. *Id.* He expected further recovery over time and recommended a follow up in two months. *Id.*

Nearly a year later, on June 30, 2020, Petitioner presented to a different neurologist, Dr. Ryan Barmore, "to update his records" and to obtain "an updated report for his insurance." Ex. 14 at 2. Petitioner reported that he had been "doing very well in the interim." *Id.* However, he had "a residual burning sensation… about 6 inches in size" without pain in his upper back, mild sensory symptoms in his hands and the balls of his feet, and decreased stamina since the GBS onset. *Id.* Dr. Barmore observed these symptoms on physical exam and counseled Petitioner on "fall and balance precautions given concern for the possibility of sensory ataxia in low-light conditions." *Id.*

In his affidavits, Petitioner recalls taking sick leave from December 2018 to about mid-March 2019, at which point he returned to only "light duty work." Upon his return and continuing to the preparation of his supplemental affidavit in March 2021, he can no longer work on ladders or any machines involving heights, struggles to perform his prior responsibilities, and is reduced to working only a few hours a day to avoid over-exertion or excessive fatigue. He has also hired someone to maintain his rental properties in his stead. Ex. 2 at ¶ 18; Ex. 15 at ¶ 6.[7] Petitioner avers that his residual GBS symptoms are numbness in his fingertips and feet; jitters throughout his arms and legs; pain and burning in the middle of his back; decreased stamina; slower movement; and use of an inhaler twice a day to maintain a proper oxygen level. Ex. 15 at ¶ 5.

### III.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an

---

[7] In his supplemental affidavit, Petitioner avers that he took sick leave from "December *2020* until the middle of March *2020.*" Ex. 15 at ¶ 6 (emphasis added). Both years are clearly incorrect and understood to be typographical errors.

award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)). I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[8]  *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

---

[8] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

IV.   **Appropriate Compensation for Petitioner's Pain and Suffering**

In this case, awareness of the injury is not disputed. The record reflects that at all times, Petitioner was a competent adult with no impairments that impacted his awareness. Therefore, I analyze principally the severity and duration of his injury.

In requesting $140,000.00, Mr. Sand emphasizes my past recognition that: "GBS is a serious injury, and Petitioner's pain and suffering award should be calculated with that in mind." Motion at 18, citing *W.B. v. Sec'y of Health & Human Servs.*, No. 18-1634V, 2020 WL 5509686, at *5 (Fed. Cl. Spec. Mstr. Aug, 7, 2020). Some individuals who develop GBS have more significant symptoms; receive emergency medical attention, hospitalization, intravenous immunoglobulin ("IVIg") and/or plasmapheresis, physical therapy; and have longer periods of severe disability.[9] And Petitioner recognizes that in comparison to those cases, he did not suffer "the most severe version of GBS." Motion at 18. However, he suggests that his case is "substantially similar" to *W.B.*, in which the petitioner was hospitalized for one day, had plasmapheresis over two weeks, completed two months of physical therapy, and his GBS largely resolved within one year except for some residual fatigue on exertion. *Id.* at 14-15; *W.B.*, 2020 WL 5509686 (awarding $155,000.00).[10]

---

[9] *See also* Ex. 16 [full citation *infra* at n. 12] at 1 (providing that GBS can lead to respiratory failure, autonomic dysfunction, and an estimated mortality rate of 3-10% "even with the best medical care available").

[10] Also instructive is *Nelson*, in which the petitioner developed progressive weakness, numbness, and difficulty with breathing and swallowing, prompting a 5-day hospitalization with IVIg followed by a 5-day inpatient rehabilitation course. The petitioner then exhibited a good recovery from GBS, without any recurrence, and at least some of his later neurological symptoms were attributed to cervical radiculopathy. *Nelson v. Sec'y of Health & Human Servs.*, No.17-1747V, 2021 WL 754856 (Fed. Cl. Spec. Mstr. Jan. 13, 2021) (awarding $155,000.00).

Respondent counters that the "the objective record" (referring only to the medical records and not the affidavits) supports that Petitioner's GBS and resulting sequelae are mild when compared to other GBS claims including *W.B.* Response at 9. Respondent emphasizes that Petitioner's case consisted of only gabapentin and acetaminophen-hydrocodone and did not involve hospitalization, respiratory compromise, IVIg or plasmapheresis, or inpatient or outpatient rehabilitation or physical therapy. *Id.* at 10. Respondent does not cite any reasoned opinions but avers that a review of past flu/GBS claims – which were presumably resolved via joint stipulations between the parties or the petitioners' acceptance of a proffer representing Respondent's valuation of their cases – supports an award of $55,000.00 for Petitioner's past pain and suffering. *Id.*

Petitioner objects to Respondent's failure to identify any reasoned opinions supporting his proposed award of $55,000.00 for a *conceded* GBS case. Reply at 3.[11] He also notes that Respondent's effective position is that Petitioner's pain and suffering from GBS is less than the median award for conceded SIRVA claims resolved either by stipulation or reasoned opinion. *Id.* at 7 (citing *Randazzo v. Sec'y of Health & Human Servs.*, No. 18-1513V, 2021 WL 829572, at *5 (Fed. Cl. Spec. Mstr. Feb. 1, 2021)).

Alongside his reply, Petitioner submitted a 2019 article[12] which supports the proposition that *prompt* treatment of GBS is preferred: "Clinical trials have demonstrated a treatment effect for [IVIg] when started within 2 weeks of the onset of weakness and plasma exchange when started within 4 weeks. Beyond these time periods, evidence on efficacy is lacking." Ex. 16 at 8. Petitioner suggests that his delayed diagnosis precluded prompt treatment, which hindered his recovery from GBS. Furthermore, when his neurologist reached a diagnosis of GBS five months after onset, the neurologist most likely concluded that IVIg treatment would no longer be effective. Reply at 5. Therefore, the absence of IVIg treatment does not demonstrate that his GBS was less severe and should not lower the pain and suffering award. *Id.*

Petitioner maintains that he has suffered residual numbness, weakness, hand tremors and fatigue for two and one-half years, which are likely to continue. Motion at 18; Reply at 5. He submitted literature supporting that: "Fatigue, unrelated to residual motor deficits, is found in 60-80% of patients with GBS and is often one of the most disabling

---

[11] To wit, my independent review has not identified any such cases. The lowest GBS past pain and suffering amount awarded to date as a result of a reasoned, published decision has been $155,000.00 -- in *W.B.* and in *Nelson*, both cited herein.

[12] S. E. Leonhard et al., *Consensus Statement: Evidence-Based Guidelines – Diagnosis and Management of Guillain-Barré syndrome in Ten Steps*, 15 Nacuture 671 (2019) [Ex. 16].

8

complaints." Ex. 16 at 10. This is potentially attributable to "post-infectious fatigue, dysautonomia, and psycho-sociological consequences of the disease." Ex. 17[13] at 7.

After reviewing the record as a whole and considering both parties' arguments, I conclude that while this case involves GBS, which is a serious injury, Mr. Sand's particular case of GBS was on the mild end of the spectrum. This conclusion is supported by his choice to consult with established providers (his primary care provider, followed by his neurosurgeon), then wait for a referral to a neurologist several weeks into the course, rather than seeking emergency medical attention. Mr. Sand was fortunate to avoid severe complications such as respiratory failure and autonomic dysfunction. By his own admission, within about four months of GBS onset, the most disruptive symptom – the acute pain in his upper back – largely resolved and he returned his focus to his chronic lumbar pain.

In addition, Petitioner's vaccine-caused GBS occurred in the midst of his grappling with some facially-related symptoms. He was receiving treatment for neuropathic pain right around the time his GBS manifested, and its comorbid existence made it difficult for treaters to distinguish the true nature of his December 2018 symptoms. His chronic lumbar pain and COPD may also partially explain his reports of decreased stamina even after his GBS had initially resolved.

On the other hand, Respondent does not give sufficient credence to the seriousness of GBS in general or the facts of this specific case. At the outset of Mr. Sand's injury, he consistently reported significant pain, rated at 9-10 /10, for which he consulted three different providers and repeatedly reported that prescription pain medications did not provide adequate relief. Mr. Sand was initially assessed with new thoracic back pain (due to his prior history of *lumbar* back pain and presentation to a neurosurgeon), which delayed his referral to a neurologist until at least one month into the course. The diagnosis was further confounded by the neurologist's apparent difficulty in scheduling and/or insufficient resources for electrodiagnostic testing.

The record also reflects Petitioner's anxiety while awaiting a definitive diagnosis, especially in light of the differential which included a slower but ultimately fatal neurodegenerative condition, ALS. Mr. Sand also took leave from his full-time job while dealing with the acute pain. Finally, despite the one-year gap between his last encounter with Dr. Bjork and follow-up with Dr. Barmore, both neurologists observed that Mr. Sand was slowly and gradually improving from his GBS, but had some persisting, albeit mild, sensory symptoms at the small of his back, hands, and feet. This is consistent with Mr.

---

[13] J.M. de Vries et al., *Fatigue in Neuromuscular Disorders: Focus on Guillain-Barré syndrome and Pompe Disease*, 67 Cell. Mol. Life Sci. 701 (2010) [Ex. 17].

Sand's submitted literature which suggests that an earlier diagnosis of GBS in his case may have prompted treatment and a better recovery, and that GBS sequelae including fatigue can persist for some time.

Based on the record before me, I conclude that the amount to be awarded for actual pain and suffering in this case is close to what Petitioner requests, although slightly less. Petitioner has far better substantiated his demand than Respondent, and the number he seeks reasonably balances the seriousness of GBS generally and the limited degree of pain and suffering in his specific case. A six-figure award is justified, given the personal suffering imposed on Petitioner due to reasonable fear from the condition and the toll it took on him professionally. However, I do give some weight to the complete lack of a need for hospitalization, and also the fact that Petitioner's comorbidities intermingled with what was later seen in hindsight as his initial GBS presentation. I therefore find a fair award in this case is $130,000.00.

## V. Conclusion

I award Petitioner a lump sum payment of **$130,000.00 for actual pain and suffering.** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this decision.[14]

**IT IS SO ORDERED.**

    **s/Brian H. Corcoran**
    Brian H. Corcoran
    Chief Special Master

---

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.